UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JAMES STERN,                         )
                                     )
              Plaintiff,             )
                                     )
       v.                            )        No. 4:09 CV 2028 CAS/DDN
                                     )
MICHAEL J. ASTRUE,                   )
Commissioner of Social Security      )
                                     )
              Defendant.             )

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This action is before the court for judicial review of the final
decision of the defendant Commissioner of Social Security denying the
application of plaintiff James Stern for disability insurance benefits
under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401
et seq.,[1] and for supplemental security income benefits based upon
disability, under Title XVI of the Act, §§ 1381 et. seq. The action was
referred to the undersigned United States Magistrate Judge for review and
a recommended disposition under 28 U.S.C. § 636(b). For the reasons set
forth below, the undersigned recommends that the ALJ's decision be
affirmed.

**I.  BACKGROUND**

Plaintiff was born in October, 1987. (Tr. 12.) He graduated from
high school in 2006. (Tr. 277.) He is single and lives with his mother
and grandmother. (Tr. 517.) He last worked delivering pizzas for two
restaurants in 2008. (Tr. 518.)

Plaintiff applied for insurance benefits based on disability and for
supplemental security income on January 17, 2007. (Tr. 12.) He
originally alleged an onset date of disability of January 1, 2000, due

_____

[1]Although the record indicates that plaintiff applied for child's
disability benefits, the ALJ noted that there was no such application
before him at the hearing. (Tr. 12.) In any event, neither party
challenges the nature of plaintiff's application or the framework of the
administrative law judge's analysis.

to emotional and mental disorders. (Tr. 14.) Plaintiff later amended his alleged onset date of disability to July 20, 2005. (Tr. 12.)

On April 18, 2007, plaintiff's applications were denied by the Commissioner. (Tr. 12.) On October 22, 2007, plaintiff filed a timely written request for a hearing. (Tr. 12.) On July 7, 2009, an administrative law judge ("ALJ") conducting a hearing, at which plaintiff appeared and testified.[2] (Tr. 12.) On August 4, 2009, the ALJ denied plaintiff's applications for benefits. (Tr. 9-21.) On August 24, 2009, plaintiff timely filed a request for review by the Appeals Council. (Tr. 8.) On October 6, 2009, the Appeals Council denied plaintiff's request for review. (Tr. 4-7.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. MEDICAL AND OTHER HISTORY

On March 3, 1995, Garrett C. Burris, M.D., wrote a letter to Glen Fenton, M.D., after examining plaintiff. (Tr. 252-55.) In his letter, Dr. Burris noted plaintiff's problems with attention and behavior, and poor response to medical treatment and therapy. (Tr. 252.) Dr. Burris also noted that plaintiff "was thought to have criteria for a written expression learning disability," but also that plaintiff "was capable of meeting grade level expectations in reading and math, and quite possibly in written expression, when motivated and attending to task. . . ." (Tr. 252.) Dr. Burris also spoke with plaintiff's teachers, whose observations included that plaintiff suffered from extreme restlessness, impulsivity, inattention, and distractibility, and that plaintiff was generally disruptive. (Tr. 253.) One teacher specifically stated that plaintiff was loud, active, argumentative, and had peculiar behaviors, such as acting out with animal noises. (Tr. 253.) Plaintiff's mother was concerned about his distractibility, restlessness, impulsive talking, and disruptive behavior. (Tr. 253.) Dr. Burris diagnosed plaintiff as having central neurologic dysfunction manifested by attention deficit

---

[2]The hearing was originally scheduled for May 27, 2009, but due to an issue with the electronic and paper files, the ALJ reset the hearing for July 7, 2009. (Tr. 500-11.)

hyperactivity disorder ("ADHD"), a possible leaning disability, and a history of tics.[3]  (Tr. 255.)  Dr. Burris adjusted plaintiff's medications, but noted the uncertainty of the effect and possible improvement.  (Tr. 255.)

On April 7, 1995, Dr. Burris noted that following plaintiff's medication change and transfer to a school with a self-contained learning disability program, plaintiff's mother felt that there had been a "remarkable difference" in his behavior, self control, and presence in the classroom, resulting in academic improvement.  (Tr. 251.)

On June 28, 1995, Dr. Burris noted that plaintiff had a good school year, and was showing good impulse control, a greater ability to focus, and a good response to medication.  Plaintiff's mother described problems with his afternoon behavior, when he became irritable, angry, and temperamental.  Dr. Burris recommended that additional medicine be taken in the afternoon.  (Tr. 250.)

On February 2, 1996, Dr. Burris noted that plaintiff excelled academically, but still had significant difficulty with distractibility, and required redirection.  (Tr. 249.)  On June 7, 1996, Dr. Burris again noted the general effectiveness of plaintiff's medication.  Dr. Burris also noted plaintiff's difficulty making transitions to classes and plaintiff's irritability and moodiness in the afternoon.  (Tr. 248.)  On March 26, 1997, Dr. Burris wrote that plaintiff had done well in school — being placed on the honor roll — despite still having significant problems with impulse control and behavior.  (Tr. 247.)

Dr. Burris's records indicate that plaintiff continued to improve over the next year, showing better organization, progress at school, ability to focus, impulse control, and less irritability.  (Tr. 246-44.) On December 16, 1998, Dr. Burris noted that plaintiff was doing very well at school and at home until two weeks earlier, when plaintiff became more impulsive, silly, and argumentative.  (Tr. 243.)  On May 31, 2000, Dr.

---

[3]A tic is a habitual, repeated contraction of certain muscles, resulting in stereotyped individualized actions that can be voluntarily suppressed for only brief periods, e.g. clearing the throat, sniffing, pursing the lips, excessive blinking; there is no known pathologic substrate.  Stedman's Medical Dictionary 1989 (28th ed. 2006).

Burris again noted plaintiff's difficulty staying focused and maintaining self-control. (Tr. 242.)

The Special School District of St. Louis County held a conference on June 13, 2001, to discuss plaintiff. (Tr. 215-23.) The records indicated a diagnosis of a learning disability and ADHD, and concerns regarding his cognition, reading, math, written expression skills, and his overall health. (Tr. 216-17.) The diagnostic team ultimately certified his need for special education and related services. (Tr. 223.)

On December 3, 2001, Dr. Burris opined that plaintiff still needed to improve his organization, task completion, and study habits, but that his behavior and grades were improving. (Tr. 239.)

The Special School District of St. Louis County met and formed a Services Plan on September 16, 2002. (Tr. 208-13.) The records indicate that plaintiff's teacher believed plaintiff was not adjusting well, as he had several failing or near-failing grades and was missing assignments. Plaintiff's teacher believed he was more concerned with his social behavior than his academics. The recommended accommodations for plaintiff included a modified curriculum, having materials presented in small "chunks," extended time to process information, preferential seating, and extended time to complete assignments. (Tr. 209.)

On February 28, 2003, Dr. Burris recommended plaintiff undergo a psychiatric evaluation, following an argument between him and his mother, during which plaintiff screamed that he was going to kill himself. Dr. Burris also mentioned the possibility that plaintiff suffered from bipolar disorder. (Tr. 237.)

From June, 2003 through December, 2006, plaintiff met with Jeff Schulman, M.D., for psychiatric issues. During this time, Dr. Schulman diagnosed plaintiff with ADHD and bipolar disorder, and prescribed various medications, including Lexapro and Seroquel.[4] (Tr. 275-85.)

---

[4]Lexapro is an antidepressant medication used to treat a variety of conditions, including depression and other mental/mood disorders. Seroquel is used to treat certain mental/mood conditions (such as bipolar disorder and schizophrenia). WebMD, http://www.webmd.com/drugs/index-drugs.aspx (last visited December 7, 2010).

On July 20, 2005, Dr. Schulman indicated that plaintiff was "more depressed lately," and that plaintiff "[didn't] feel like he [was] good enough." (Tr. 285.) Dr. Schulman's October 17, 2005 progress notes indicate that plaintiff hated school because it was stressful, and was also angrier and unable to sleep. (Tr. 282.) On January 3, 2006, he felt lonely, bored, and depressed. (Tr. 280.) By June 12, 2006, he had graduated from high school. That day, he felt irritable and tired, could not rest without taking his medication, and had difficulty falling asleep and waking up. (Tr. 277.)

On October 28, 2005, one of plaintiff's teachers, Lauren Harrison, completed a Koller Adolescent and Adult Behavior Scale-Revised report. In her report, Harrison indicated that plaintiff had difficulty remembering auditory stimuli or sequences, failed to get the meaning from spoken words or environmental sounds, had difficulty remembering and revisualizing images or sequences, had difficulty attending to or distinguishing between visual stimuli, failed to react or seemed to do everything in slow motion, and had nervous habits. Ms. Harrison also indicated that plaintiff was not disobedient, defiant, stubborn, resentful, or angry, did not have difficulty attending to or distinguishing between sounds, and easily established working relationships with others. (Tr. 323-24.)

On September 11, 2006, Beth Brown wrote a vocational evaluation report, assessing plaintiff's vocational goals. Among the listed barriers to employment opportunities were that he was very impulsive, distractible, had poor concentration, made quick decisions, and made frequent mistakes. Other barriers were that he had poor academic skills in English and math, poor listening and short-term memory skills, poor finger dexterity, that he was dependent on his mother, that he was immature and had difficulty following through, his work history, mood swings, and his asthma symptoms. (Tr. 263.) Plaintiff also could not concentrate enough to fill out a personal history form, and had his mother fill it out for him instead. (Tr. 264.) Ms. Brown recommended plaintiff pursue carpentry, cabinetmaking, kitchen remodeling or installation, construction work, plumbing, pipefitting, building maintenance, dry walling, or other building or repair jobs. (Id.)

- 5 -

On September 27, 2006, Mary V. Gooch, Ph. D., administered a Wechsler Adult Intelligence Scale III ("WAIS") test. (Tr. 257-62.) Dr. Gooch described plaintiff's early prenatal history as "very complex," as there was a report of bleeding in the first 3 months of pregnancy, with the water breaking one week into the fourth month, and with birth at 27 1/2 weeks. He weighed 3 pounds at birth. There was reportedly no brain activity for the first 8 hours after birth, and his mother was told that he would likely not survive, or would at least be severely handicapped. He was diagnosed with bronchopulmonary dysplasia[5] and reportedly was the first boy to survive an experimental respirator in 1987, which was subsequently discontinued. He was in the hospital for 2 months, on oxygen and a heart monitor for the first 18 months, and was bottle-fed until 18 months old because he was unable to eat. He was diagnosed with ADHD at age 4 or 5. (Tr. 257.) Dr. Gooch's report also noted that plaintiff's father died of a heroin overdose when plaintiff was 10 years old, although plaintiff's mother did not learn of his death until a year later. (Tr. 257-58.) Regarding plaintiff's work history, the report stated that he worked at Bill's Auto Repair for 2 hours and then walked out; at restaurant for 2 months before quitting because his boss made fun of his attention problems; for a family friend for 2 months listing books online to sell, but was fired because he made too many mistakes; and at Grand Prix Speedway as a flag-waiver, but quit. (Tr. 258.) Dr. Gooch diagnosed plaintiff with a GAF score of 50.[6] (Tr. 261.)

---

[5]Bronchopulmonary dysplasia is a chronic pulmonary insufficiency seen primarily in infants born prematurely. Stedman's at 600.

[6]A GAF score, short for Global Assessment of Functioning, helps summarize a patient's overall ability to function. A GAF score has two components. The first component covers symptom severity. The second component covers functioning. A patient's GAF score represents the worst of the two components. On the GAF scale, a score from 41 to 50 represents serious symptoms (such as thoughts of suicide, severe obsessional rituals, frequent shoplifting), or any serious impairment in social, occupational, or school functioning (such as the inability to make friends or keep a job). American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32-34 (4th ed. 2000).

On March 26, 2007, Robert Fucetola, Ph.D., ABPP-CN, prepared a neuropsychological report. (Tr. 325-29.) According to Dr. Fucetola's report, plaintiff was educated through a special school district program, and generally struggled academically. Plaintiff was also suspended in high school for disciplinary reasons. Plaintiff's mother stated that he was sexually victimized by a friend's mother 2-3 years prior. (Tr. 325.) Plaintiff had difficulty maintaining a job, and often quit shortly after being hired because of disagreements with colleagues and managers. Plaintiff's mother also stated that he has trouble focusing and sustaining attention. (Tr. 326.) Tests administered by Dr. Fucetola revealed that plaintiff's simple auditory attention and working memory were within normal limits, but his sustained attention was markedly impaired; executive abilities were moderately impaired; fine motor dexterity was mildly impaired bilaterally; and anterograde memory (new learning and recall) were severely impaired. (Tr. 327.)

A June 30, 2007 report from the Center for Head Injury Services noted that plaintiff had good physical abilities, no difficulties with balance, fine motors skills, and good stamina. (Tr. 330.) Plaintiff also had limitations on his ability to focus, was reluctant to use strategies to remember important information, and had poor motivation, decreased self-confidence, and attendance problems. (Tr. 331-32.)

Records from plaintiff's September 20, 2007 appointment with the Rehabilitation Institute of St. Louis indicate that plaintiff had problems with cognition, memory, attention, and executive functions. (Tr. 440.) The records also indicate that he had a brain injury since childhood, ADHD, bipolar disorder, and difficulties with functional memory, cognition, and attention for management of his day to day routine. (Tr. 442.) Plaintiff was unable to maintain a job, and was employed for 3-4 weeks to deliver pizzas but had difficulty reversing directions and difficulties with coworkers. (Tr. 442-45.) A cognitive evaluation revealed that his attention abilities were maximally impaired; problem solving and reasoning skills were moderately impaired; memory was moderately impaired; executive functions were maximally impaired; insight was moderately impaired; and his safety awareness was moderately impaired. (Tr. 449.)

On October 1, 2007, plaintiff underwent outpatient speech and occupational therapy. The therapist discussed memory strategies, including using a cell phone to remember appointments. (Tr. 438.) Plaintiff stated that he had difficulty with memory and organization. Plaintiff arrived 15 minutes late to the appointment, but called to let the therapist know he was running late. (Tr. 439.)

On October 4, 2007, plaintiff was admitted to St. John's Mercy Medical Center for lithium toxicity, agitation, tremors, and insomnia. His physician, Vijayakurmari Reddy, M.D., noted his history of ADHD and bipolar disorder, mild elevation of ALT level, and history of bronchial asthma. Plaintiff was taking Invega, Vyvanse,[7] and Seroquel, and that his lithium level was 1.9. Plaintiff was given Ativan,[8] Seroquel, and IV fluids. Dr. Reddy diagnosed tachycardia[9] as relating to plaintiff's lithium level, and sent plaintiff to the telemetry floor for monitoring. Dr. Schulman then saw plaintiff and reduced his lithium medication, added Klonopin for three days,[10] and scheduled outpatient appointments for one to two weeks. Dr. Reddy discharged him with prescriptions for Lithium Carbonate, Klonopin, and continuation of his medications: Seroquel, Invega, Vyvanse, Singulair, and Nexium.[11] (Tr. 345-47.)

---

[7]Invega is used to treat certain mental/mood disorders. Vyvanse is used to treat attention deficit hyperactivity disorder as part of a total treatment plan, including psychological, social, and other treatments. It may help to increase the ability to pay attention, stay focused, and stop fidgeting. WebMD, http://www.webmd.com/drugs/index-drugs.aspx (last visited December 7, 2010).

[8]Ativan is used to treat anxiety by acting on the brain and nerves to produce a calming effect. WebMD, http://www.webmd.com/drugs/index-drugs.aspx (last visited December 7, 2010).

[9]Tachycardia is rapid beating of the heart, conventionally applied to rates over 90 beats per minute. Stedman's at 1931.

[10]Klonopin is used to treat seizure disorders and panic attacks. WebMD, http://www.webmd.com/drugs/index-drugs.aspx (last visited December 7, 2010).

[11]Singulair is used as a long-term (maintenance) treatment to prevent or treat asthma. Nexium is used to treat acid-related stomach and throat (esophagus) problems. WebMD, http://www.webmd.com/drugs/index-drugs.aspx
(continued...)

From October 10, 2007 to January 14, 2008, plaintiff visited the Rehabilitation Institute of St. Louis on 10 occasions. (Tr. 404.) On October 10, 2007, plaintiff reported that he was confused as to whether he took his medication, and had to go to the hospital. (Tr. 436.) He arrived 15 minutes late to his October 15, 2007 meeting, at which he performed mock interviews for a job interview scheduled for that afternoon. (Tr. 433.) On October 24, 2007, he stated that he was having difficulties getting out of bed because of new medications. (Tr. 429.) On November 1, 2007, the therapist and plaintiff discussed the results of plaintiff's Career Assessment Inventory, which stated that he was best suited working with tools rather than people, and in an occupation that required less schooling. (Tr. 428.) On November 8, 2007, he participated in a Structured Work Activity Group, but the therapist noted that plaintiff's very poor organizational strategies led to inaccurate completion, and plaintiff's attention to detail was very impaired. Plaintiff was much more successful on his second try to complete the task, as the therapist noted that plaintiff paid better attention to detail and had a good finished product. Plaintiff also indicated interest in union training in the field of general building or carpentry. (Tr. 426.) Plaintiff arrived 20 minutes late to his November 9, 2007 meeting, but otherwise had a productive meeting. (Tr. 423.) On November 13, 2007, plaintiff stated that he wanted to go back to delivering pizzas. He also displayed difficulty with instructions in paragraph form. (Tr. 422.) On November 15, 2007, plaintiff was distracted, unable to concentrate to complete tasks because he forgot to take his afternoon medication, and was 30 minutes late to his occupational therapy appointment. (Tr. 419-20.) Plaintiff arrived an hour early for his November 21, 2007 appointment because he thought his appointment was an hour earlier. (Tr. 417.)

A November 26, 2007 progress note indicated that plaintiff had moderate cognitive-linguistic deficits in attention, memory, problem solving, and executive functioning. (Tr. 416.) On November 27, 2007,

---

[11](...continued)
(last visited December 7, 2010).

plaintiff was able to complete an occupational therapy project despite the project having "too many pieces." (Tr. 415.) Plaintiff arrived a few minutes late to his December 10, 2007 appointment. (Tr. 411.) The January 7, 2008 report states that plaintiff had a significant barrier in attaining a part-time job, namely psychological issues and a poor work ethic. (Tr. 406.)

On October 22, 2007, Zafar Rehmani, M.D., evaluated plaintiff. Dr. Rehmani noted that plaintiff had difficulty getting up in the morning, that Ritalin[12] knocked him out, that he damaged a bathroom door in eighth grade, and that he had fights during his freshman year of high school. (Tr. 476.) Given plaintiff's history of ADHD and bipolar disorder, Dr. Rehmani assessed plaintiff with a GAF score of 50-60.[13] Dr. Rehmani changed plaintiff's medications. (Tr. 477.)

November 5, 2007 and November 19, 2010 progress notes from Dr. Rehmani stated that plaintiff was suffering from appetite disturbance, sleep disturbance, anergia, psychomotor retardation, psychomotor agitation, job/school performance problems, family relations problems, and impaired concentration. (Tr. 474-75.)

On January 9, 2008, plaintiff met with Dr. Rehmani and was feeling good, despite being unemployed, unable to find a job, and tired. (Tr. 473.) On January 25, 2008, plaintiff met with Dr. Rehmani and was sad and was crying at night. (Tr. 472.) On February 16, 2008, plaintiff was doing good, although Dr. Rehmani noted that plaintiff did not want to talk at times and had difficulty sitting still. (Tr. 471.) On March 5, 2008, plaintiff was still doing "good." (Tr. 470.) On April 2, 2008, Dr. Rehmani noted that plaintiff had trouble sitting still, and was using marijuana. (Tr. 469.) On April 30, 2008, plaintiff was "not so good,"

---

[12]Ritalin is used to treat attention disorders (ADHD) as part of a total treatment plan including psychological, educational, and social measures. WebMD, http://www.webmd.com/drugs/index-drugs.aspx (last visited December 7, 2010).

[13]On the GAF scale, a score from 51-60 represents moderate symptoms (such as flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (such as few friends, conflicts with peers or co-workers). Diagnostic and Statistical Manual of Mental Disorders at 32-34.

had been arrested, and was still using marijuana. (Tr. 468.)  On May 28, 2008 and June 25, 2008, plaintiff was doing better.  (Tr. 466-67.)   On July 23, 2008, plaintiff was "not so good."  Dr. Rehmani noted that plaintiff got easily frustrated, and had gotten angry and broken the lawnmower.  (Tr. 465.)  At his August 20, 2008, September 17, 2008, and October 15, 2008 appointments, plaintiff was doing "really good, "good," and "fine," respectively.  (Tr. 464-42.)  On November 12, 2008, plaintiff forgot to take his medications, was still using marijuana, and could not control the urge to do so.  (Tr. 461.)  On December 10, 2008, Dr. Rehmani noted that plaintiff was doing "good," his mood had been good, and his work was going fine, despite suffering from ADHD and bipolar disorder.  (Tr. 459-60.)  On January 14, 2009, plaintiff was doing fine.  (Tr. 458.)  On each of his February, March, and April appointments, plaintiff was doing good.  (Tr. 457-55.)

On January 14, 2008, Matthew Dodson, OTD, OTR/L, of the Rehabilitation Institute of St. Louis, prepared a report detailing plaintiff's treatment and progress.  Dr. Dodson worked extensively on career exploration with plaintiff, and noted that plaintiff attended only half of his scheduled appointments.  Dr. Dodson also noted that plaintiff was susceptible to distraction with work tasks, reacted negatively to failed experiences, and displayed poor motivation when he found a task difficult.  According to Dr. Florian, these traits were consistent with someone with an avoidant personality, which Dr. Florian believed plaintiff had.  Dr. Dodson found plaintiff's work history consistent with that diagnosis.  Dr. Dodson also found that plaintiff had functional limitations in attentional processing, and that tasks requiring more than two steps were difficult for him to accomplish.  Dr. Dodson recommended that plaintiff pursue a job requiring little manipulation of information. Dr. Dodson noted that plaintiff performed better when the end product of his efforts was readily observable, thereby providing instant feedback on his performance; the more he applied effort without confirmation of success, the less likely he was to remain engaged in the task, and the more likely it was that he would make mistakes.  (Tr. 404-05.)  Because of plaintiff's cognitive limitations and poor interpersonal interaction style, Dr. Dodson recommended that plaintiff explore working in a trade

rather than in a customer service role. Dr. Dodson noted that because plaintiff was unable to carry out job tasks independently, positions where he would be directed by others were preferable. Dr. Dodson recommended that plaintiff have extensive support when entering a job, but was concerned about plaintiff's work ethic. (Tr. 405.)

From October 22, 2008 to May 13, 2009, plaintiff visited Dr. Florian on 23 occasions. (Tr. 478-95.) On October 22, 2008, Dr. Florian noted plaintiff's drug and alcohol use. (Tr. 495.) On November 12, 2008, Dr. Florian noted that plaintiff was trying to quit using marijuana, but using it helped him sleep. (Tr. 492.) On November 24, 2008, Dr. Florian noted that plaintiff was still using marijuana, and was drinking because of stress. (Tr. 491.) On December 10, 2008, Dr. Florian again noted that plaintiff was using marijuana, and that he went to bed between 2 and 3 a.m. (Id.) On March 18, 2009, plaintiff told Dr. Florian that he felt shaky in the morning when waking up. (Tr. 484.) On April 22, 2009, Dr. Florian noted that plaintiff stated that he was not drinking anymore, and was using marijuana less, although he remained unmotivated. (Tr. 481.) On April 29, 2009, plaintiff told Dr. Florian that he quit using marijuana. (Tr. 480.)

On November 12, 2008, Dr. Florian completed a Medical Assessment of Ability to Do Work-Related Activities (Mental) form. (Tr. 493-94.) Dr. Florian opined that plaintiff's ability to follow work rules, relate to co-workers, and deal with the public was fair, while his ability to use his judgment, deal with work stresses, function independently, and maintain attention/concentration was poor or non-existent. Dr. Florian explained that plaintiff had a poor attention span, was impulsive, often exercised poor judgment, had learning disabilities, had poor perseverance with difficult tasks, would be lucky to make half of his appointments, was "anxious of new jobs and looking stupid," and quit or got fired by not showing up for his job. (Tr. 493.) Dr. Florian also noted that plaintiff had a fair ability to understand, remember and carry out simple job functions, but either a poor or no ability to understand, remember, and carry out either detailed or complex job instructions. Dr. Florian also opined that plaintiff had a good ability to maintain his personal appearance, a fair ability to behave in an emotionally stable manner and

relate predictably in social situations, and either a poor or no ability to demonstrate reliability. With regard to these assessments, Dr. Florian explained that plaintiff was learning disabled and had ADHD, which allowed him to follow only one direction at a time, so long as he did not forget or become anxious. (Tr. 494.)

**Report from Plaintiff's Mother**

On February 1, 2007, plaintiff's mother completed a Function Report — Adult — Third Party. (Tr. 140-48.) Ms. Stern reported that plaintiff had limitations with standing, sitting, talking, memory, completing tasks, concentration, understanding, following instructions, and occasionally had limitations regarding getting along with others. (Tr. 145.) Ms. Stern also stated that plaintiff handled stress through avoidance behaviors or would make statements about suicide, and did not handle "spur of the moment" changes well. (Tr. 146.)

**Evaluation by Dr. Judith McGee**

On April 13, 2007, Judith McGee, Ph.D., completed a Psychiatric Review Technique of plaintiff, in which Dr. McGee diagnosed ADHD and bipolar disorder. (Tr. 308, 10.) That same day, Dr. McGee completed a Mental Residual Functional Capacity Assessment. (Tr. 304-06.) Dr. McGee opined that plaintiff was moderately limited in his ability to understand and remember detailed instructions, carry out detailed instructions, and maintain attention and concentration for extended periods. (Tr. 304.) Dr. McGee also opined that plaintiff was moderately limited in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a constant pace without an unreasonable number and length of rest periods. (Tr. 305.) Dr. McGee further opined that plaintiff was moderately limited in his ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and in his ability to travel in unfamiliar places or use public transportation. (Tr. 305.)

**Testimony at the Hearing**

A hearing was conducted before an ALJ on July 7, 2009. Plaintiff testified that he was twenty-one years old, had completed high school, and lived with his mother and grandmother. (Tr. 517.)

Plaintiff testified that he was not working at the time of the hearing, but had previously worked in 2008 delivering pizza for two pizza restaurants. (Tr. 518.) Before that, plaintiff worked as a waiter for an agency that filled temporary jobs. (Id.) Plaintiff also worked at Grand Prix Speedways in 2006, and at a restaurant in 2004. (Id.)

Plaintiff testified that he is unable to work because he cannot focus and pay attention for longer than a few minutes at a time. (Tr. 520.) At to his pizza delivery jobs, plaintiff would forget his wallet and mix up customer orders, causing him to deliver the wrong pizzas to customers. (Tr. 520-21.) Plaintiff is also very forgetful, and has anxiety, difficulty learning new things, and struggles with reading comprehension. (Tr. 521, 526-27.)

Plaintiff testified that he sees Dr. Florian weekly. (Tr. 522.) He started using marijuana shortly after high school, and although he still uses marijuana, he reduced his overall intake after attending rehabilitation by taking Clonazepam, which his doctor prescribed. (Tr. 522-23, 528.) On a regular day, he sees his girlfriend, goes to the gym, sees friends, goes out to a movie, and does his chores. (Tr. 525.) Plaintiff added that he was unable to do physical activities at that time due to a surgery on his stomach, and that he struggled with watching movies because he needed to walk around during the movie. (Tr. 525, 27.)

Plaintiff's mother also testified at the hearing. She testified that plaintiff had problems at his previous jobs with supervisors taunting him because of his disabilities. (Tr. 530-31.) She also testified that he has problems with "little tasks," such as turning on the washing machine or dryer, leaving water running in bathrooms, and leaving the refrigerator door open. (Tr. 531.) She further testified that he has trouble reading social cues, and has trouble understanding an entire conversation, but instead picks out certain words, which he interprets to mean something different than what was actually said. (Tr.

535-36.)  Although she does not approve of his marijuana use, she testified that using marijuana calms him down.  (Tr. 536-37.)

John E. Grenfell, Ed. D., a vocational expert (VE), testified that he had an opportunity to view the vocational information on plaintiff. (Tr. 540.)  The VE testified that plaintiff did not have any past relevant work because he never engaged in substantial gainful activity. (<u>Id.</u>)

The ALJ asked the VE about three hypothetical individuals.  First, the VE first testified as to a hypothetical individual of plaintiff's age, education, and experience who had no past relevant work; who had no exertional limitations; who should avoid even moderate exposure to hazardous machinery; who is limited to performing simple tasks only; and who should not perform any high production rate jobs.  (Tr. 540.)  The VE testified that there were a variety of jobs that could be performed under those limitations, including a bagger in retail sales, particularly grocery stores; a dishwasher; and an auto detailer.  (Tr. 541.)

Second, the VE testified as to the same hypothetical, but also that any jobs could have no more than occasional contact with the general public and coworkers.  (<u>Id.</u>)  The VE testified that the bagger job would not be available, but that the dishwasher and auto detailer jobs were still available.  (<u>Id.</u>)

Third, the VE testified to the same hypothetical as the second, except also that any job must allow for occasional unscheduled disruptions of both the work day and work week, secondary to potential periods of decompensation and necessity for treatment, and an inability to concentrate.  (Tr. 541-42.)  With those restrictions, the VE testified that there were no jobs in the national or regional economy available. (Tr. 542.)

When asked to assume the limitations given by Dr. Florian — poor or no ability to maintain attention or concentration, function independently, deal with work stresses, or use judgment, the VE testified that there was no substantial gainful employment available.  (<u>Id.</u>)

### III. DECISION OF THE ALJ

The ALJ followed the required regulatory five-step procedure in reaching a decision. At Step One, the ALJ found that plaintiff had not engaged in substantial gainful activity since July 20, 2005, the alleged disability onset date. (Tr. 14.)

At Step Two, the ALJ found that plaintiff suffered from the severe impairments of ADHD, affective mood disorders, and polysubstance abuse. The ALJ noted that it was uncertain whether plaintiff had bipolar disorder, and that plaintiff began improving in November, 2005, following modifications to his medications. The ALJ also noted that, although plaintiff could become restless and fidgety, plaintiff remained attentive to directions and stayed on task during a structured one-on-one situation. (Tr. 14-17.)

The ALJ also relied on plaintiff's WAIS and Woodcock Johnson Psychoeducational Battery test scores. The ALJ found that these scores supported some limitation, but that ultimately plaintiff's overall performance was within the low average range. The ALJ acknowledged Dr. Fucetola's findings, as well as plaintiff's mothers statements that he had difficulty with organization and short term memory. The ALJ viewed plaintiff's Wechsler Memory Scale, Wisconsin Card Sorting Test, and Delis-Kaplin Executive Function Systems results, which supported a finding of some impairment, with Dr. Fucetola's behavioral observations, which were generally normal. The ALJ found that plaintiff's conversational speech, thought processes, and overall attentiveness through the evaluation process undermined his claims. (Id.)

The ALJ also discussed Dr. Rehmani's diagnoses, that plaintiff suffered from ADHD, bipolar disorder, and cannabis abuse. The ALJ discredited Dr. Rehmani's records as inconsistent, but otherwise found that Dr. Rehmani's records noted no abnormalities in plaintiff's ability to sustain attention and concentration, nor in his orientation and memory. (Id.)

The ALJ then addressed the findings of Dr. Florian, which generally pertained only to plaintiff's drug and alcohol abuse and did not support plaintiff's claims. (Tr. 17.)

At Step Three, the ALJ found that plaintiff's impairments did not meet or medically equal a listed impairment. (Id.)

At Steps Four and Five, the ALJ found that plaintiff had no past relevant work experience, but had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, with the only limitations being that he could perform only simple tasks requiring no more than occasional contact with the general public and co-workers, and that he was unable to perform high production rate jobs. (Tr. 17-20.)

In doing so, the ALJ discredited plaintiff's testimony because of his ability to perform daily tasks.  The ALJ relied on Dr. Rehmani's reports, and discounted Dr. Florian's reports as conclusive and not supported by medical evidence.  The ALJ also found Dr. Gooch's GAF assessment of 50 as not supported by the record.  The ALJ then relied on the VE's testimony that plaintiff could work as a dishwasher or auto detailer, both of which were jobs that existed in significant numbers in the national and regional economy.  (Tr. 20-21.)

## IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole.  Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Id.  In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision.  Id.  As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently.  See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in

death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d 935, 942 (8th Cir. 2009). A five-step regulatory framework is used to determine whether an individual qualifies for disability. 20 C.F.R. §§ 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Id. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform his past relevant work (PRW). Id. The claimant bears the burden of demonstrating he is no longer able to return to his PRW. Id. If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work. Id.

In this case, the ALJ determined that plaintiff had severe impairments that did not match a listed impairment. The ALJ concluded that plaintiff was not under a disability since his alleged onset date, and had the RFC to perform a number of jobs in the national and regional economies.

## V. DISCUSSION

Plaintiff argues that the ALJ's decision is not supported by substantial evidence. First, he argues that the ALJ's RFC determination is not supported by substantial evidence. In particular, he argues that the ALJ insufficiently considered the evidence of his attention, concentration, and memory limitations, and that the ALJ failed to connect his RFC determination to supporting evidence. Second, he argues that the ALJ failed to include limitations regarding his mental impairments in his RFC calculation.

- 18 -

## A. Dr. Gooch's Opinion

Plaintiff argues that the ALJ erred in dismissing Dr. Gooch's opinion. The opinion of a consulting physician, who examines a claimant once, or not at all, generally receives very little weight. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998). See also Nevland v. Apfel, 204 F.3d 853, 585 (8th Cir. 2000) ("The opinions of doctors who have not examined the claimant ordinarily do not constitute substantial evidence on the record as a whole.") The ALJ properly refused to weigh Dr. Gooch's opinion as substantial evidence because, as the ALJ noted, Dr. Gooch was a consulting physician (Tr. 19-20), and had only examined plaintiff on one occasion, on September 27, 2006. (Tr. 257-62).

Further, the ALJ may discount a physician's opinion that is inconsistent with the physician's own findings. Halverson v. Astrue, 600 F.3d 922, 930 (8th Cir. 2010); Davidson v. Astrue, 578 F.3d 838, 842 (8th Cir. 2009). The ALJ did not err in finding that Dr. Gooch's opinion that plaintiff had a GAF score of 50 was inconsistent with her notes that plaintiff was able to remain attentive to direction and able to stay on task during a one-on-one structured situation, as well as with plaintiff's test results, which yielded low average range intellectual abilities. (Tr. 20; 257-62.)

Further, the ALJ did not err in holding that Dr. Gooch's GAF assessment was not supported by the record as a whole. (Tr. 19-20); 20 C.F.R. §§ 404.1527(d), 416.927(d). In particular, plaintiff's testimony that he is able to take care of himself, exercise, play video games and guitar, and visit with his girlfriend and other friends undermines Dr. Gooch's assessment of severe impairment. 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3). Cf. Riggins v. Apfel, 177 F.3d 689, 693 (8th Cir. 1999).

Plaintiff also argues that Dr. Gooch's opinion is supported by Dr. Schulman's notes. Although Dr. Schulman's notes indicate that on July 20, 2005, plaintiff felt "more depressed lately" (Tr. 285), by his next appointment on September 1, 2005, he was "better in general," his school and appetite were "ok," and he was sleeping "fine." (Tr. 284.) Although Dr. Schulman's October 17, 2005 notes indicate that plaintiff found school stressful, and that plaintiff was angrier, unable to sleep, and was

breaking things (Tr. 282), Dr. Schulman's November 1, 2005 notes indicate that plaintiff was doing better and that new medicine was helping significantly (Tr. 281). By November 18, 2005, plaintiff was "doing good" and was less depressed. (Id.) Although plaintiff felt lonely, bored, and depressed on January 3, 2006, he enjoyed playing video games and his guitar, and talking with friends. (Tr. 280.) By March 15, 2006, he was happier, doing better, making progress at school, reduced his anger, and had better self-control. (Tr. 278.) He graduated from high school by his July 12, 2006 meeting with Dr. Schulman, at which time he stated that he took medicine regularly through high school, and without the medicine he felt tired yet could not sit still. (Tr. 277.) At his August 24, 2006 meeting, plaintiff said that his medicine was "really help[ing]" (Tr. 276), and at his last appointment with Dr. Schulman on December 4, 2006, plaintiff was employed and happy. (Tr. 275.)

Plaintiff also argues that Dr. Schulman regularly diagnosed plaintiff with ADHD and bipolar disorder and prescribed plaintiff medications accordingly. (Tr. 275-285.) This does not undermine the ALJ's findings, as the ALJ found that plaintiff had severe impairments of ADHD, affective mood disorders, and polysubstance abuse. (Tr. 14-17.)

Plaintiff also argues that the September 20, 2007 cognitive evaluation, which stated that his attention abilities and executive functions were maximally impaired (Tr. 449), supports Dr. Gooch's opinion. However, that evaluation also states that plaintiff had no difficulties with orientation, and his problem solving and reasoning skills, memory, insight, and safety awareness were only moderately impaired. (Id.) As such, the evaluation does not wholly support Dr. Gooch's GAF assessment, which the ALJ described as "indicative for serious symptomatology or serious limitation." (Tr. 20.)

In sum, the ALJ did not err in discounting Dr. Gooch's opinion.

## B.  Dr. Fucetola's Opinion

Plaintiff also argues that the ALJ's findings conflict with Dr. Fucetola's opinion. Although Dr. Fucetola found that plaintiff's sustained attention was markedly impaired; executive abilities were moderately impaired; fine motor dexterity was mildly impaired bilaterally;

and anterograde memory (new learning and recall) were severely impaired, Dr. Fucetola also found that plaintiff's simple auditory attention and working memory were within normal limits. (Tr. 327.) The ALJ also noted Dr. Fucetola's "generally unremarkable behavioral observations" (Tr. 16), referring to Dr. Fucetola's notes that plaintiff arrived to his appointment on time; was fully oriented; had fluent, articulate, and conversational speech; organized thought process and no thought disorder; was attentive throughout the evaluation and only occasionally distractible; and easily understood the test instructions. (Tr. 326.)

As such, the ALJ's findings are generally consistent with Dr. Fucetola's records. To the extent the ALJ's findings conflict with Dr. Fucetola's record, the ALJ did not err because the ALJ must resolve conflicts among the opinions of various treating and examining physicians. <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1219 (8th Cir. 2001).

## C. Dr. Rehmani's Opinion

Plaintiff argues that the ALJ erred in noting that plaintiff acknowledged that his medications helped. Plaintiff argues that Dr. Rehmani's records do not suggest that plaintiff's condition was controlled or managed by medication, and that the ALJ erred in so finding. (Tr. 19.) "Impairments that are controllable or amenable to treatment do not support a finding of disability." <u>Kelley v. Callahan</u>, 133 F.3d 583, 589 (8th Cir. 1998); <u>Kisling v. Chater</u>, 105 F.3d 1255, 1257 (8th Cir. 1997).

Plaintiff argues that Dr. Rehmani noted that on January 25, 2008, plaintiff was "really bad yesterday" and was crying at night (Tr. 472); on February 6, 2008, plaintiff did not want to talk and had difficulty sitting still (Tr. 471); on April 30, 2008, plaintiff was doing "not so good" and was feeling depressed (Tr. 468); on July 23, 2008, plaintiff was again doing "not so good," and plaintiff gets easily frustrated, and "threw a fit, broke the lawn mower." (Tr. 465.)

However, Dr. Rehmani's records also indicate that plaintiff's mood was better on January 9, 2008 when he took his afternoon medicine (Tr. 473), and that plaintiff was doing better on February 6, 2008 by taking Lexapro. (Tr. 471.) Plaintiff also testified at the hearing that his

medications "definitely" helped, and that he did not have any side effects. (Tr. 525-26.)

With regard to plaintiff's moods, Dr. Rehmani's records state that plaintiff's was also "fine" in January, 2008 (Tr. 473); "doing better" in February, 2008 (Tr. 471); doing "really good" in August, 2008 (Tr. 464); "doing fine" in October, 2008 (Tr. 462); "doing good" in December, 2008 (Tr. 459); doing "good" in February, 2009 (Tr. 457); doing "good" in March, 2009 (Tr. 456); and "doing well" in April, 2009 (Tr. 455).

Given plaintiff's statements regarding the effects of his medication both to Dr. Rehmani and at the hearing, as well as plaintiff's trend of improvement through treatment, the ALJ did not err in noting that plaintiff stated that medications were effective or that Dr. Rehmani's records reflected normal mental status findings.

## D. Plaintiff's Testimony

### 1. Credibility

The ALJ also evaluated plaintiff's credibility in determining his RFC. 20 C.F.R. §§ 404.1529, 416.929. The ALJ found that plaintiff's testimony that he is able to take care of himself, exercise, play video games and guitar, and visit with his girlfriend supported his RFC assessment. (Tr. 19.) As defendant argues, plaintiff's ability to perform these activities is inconsistent with his alleged disability, Johnson v. Apfel, 240 F.3d 1145, 1149 (8th Cir. 2001), and otherwise diminishes plaintiff's credibility. Heino v. Astrue, 578 F.3d 873, 881 (8th Cir. 2009); Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005).

### 2. Motivation to Work

In addition, defendant argues that plaintiff was not motivated to work. "[E]vidence indicating a lack of motivation to work may be used as a credibility factor so long as it is not a dispositive one." Tuttle v. Barnhart, 130 Fed. App'x 60, 61 (8th Cir. 2005) (per curiam). See also Kisling, 105 F.3d at 1258.

On June 11, 2007, plaintiff's case manager at the Center for Head Injury Services stated that plaintiff "show[ed] no little initiation for

any activities other than playing computer games, surfing the internet and talking on his cell phone." (Tr. 339.) Further, plaintiff "[was] not showing motivation toward participating in tasks that [would] help him increase [his money handling and note taking skills]." (Id.) On June 30, 2007, that same case manager noted that plaintiff "express[ed] a desire to obtain employment but [was] either unable or unwilling to put forth the effort to make the behavioral changes that [would] increase his likelihood of maintaining employment." (Tr. 331.) The case manager further noted that plaintiff "demonstrated his ability to focus for periods of more than two hours on activities that he found engaging, such as surfing the [i]nternet, instant messaging with friends or playing computer games." (Id.) The case manager then commented specifically on plaintiff's motivation,

> [Plaintiff] showed little interest in participating in activities that required him to put forth any effort. When working on activities of a physical nature, [plaintiff] appeared more interested and was better able to remain on task. When his schedule included task (sic) that [plaintiff] did not like, he ignored what was scheduled and attempted to avoid supervision and instead socialized or found activities on the [i]nternet to occupy his time. While [plaintiff] expresses a desire to go to work, it appears he does not want to put forth the effort it will take for him to be successfully employed. So long as his financial needs are being met, [plaintiff] appears content with maintaining status quo. He seems comfortable with not having to take responsibility for organizing his life and making decisions. It is unlikely that his behaviors will change until he desires or is forced to take more personal responsibility to increase his independence and become more self-reliant.

(Id.) Regarding plaintiff's attendance, the case manager stated that "[plaintiff] struggled with attendance due to medical issues and/or lack of motivation to attend." (Tr. 332.) Similarly, plaintiff only attended half of his therapy sessions at the Rehabilitation Institute of St. Louis. (Tr. 404.)

In addition, on February 14, 2009, Dr. Florian noted that plaintiff stopped looking for a job, and decided to wait for disability benefits instead. (Tr. 488.) In April, 2009, Dr. Florian's noted that plaintiff had not called a possible job opportunity back, and that plaintiff was still seeking disability benefits. (Tr. 481-82.)

To the extent the ALJ discredited plaintiff's testimony based on plaintiff's lack of motivation to work, the ALJ did not err. See <u>Kisling</u>, 105 F.3d at 1258; <u>Gaddis v. Chater</u>, 76 F.3d 893, 895-96 (8th Cir. 1996).

### 3. Employment

The ALJ also stated that "[plaintiff's] pursuit of employment, particularly during a claimed disability, tends to suggest that he himself does not view his impairments as disabling." (Tr. 19.) Despite plaintiff's amended alleged onset date of July 20, 2005, (Tr. 12), plaintiff worked in 2008 delivering pizza for two pizza restaurants, as a server for an agency that filled temporary jobs, and as a flag-waiver at Grand Prix Speedways in 2006. (Tr. 518.) Plaintiff continued to search for work into 2009. (Tr. 489.) Although not dispositive, plaintiff's record of and search for employment during times of alleged disability contradicts his claim for disability benefits. See <u>Bentley v. Shalala</u>, 52 F.3d 784, 786 (8th Cir. 1995) (stating that the "record of contemplating work indicate[d] [the claimant] did not view his pain as disabling"). <u>Cf.</u> <u>Goff</u>, 421 F.3d at 792.

## B. Plaintiff's Ability to Sustain Attention and Concentration

Plaintiff also argues that the ALJ erred in stating,

Finally, despite allegations of disability herein due to ADHD, [Dr. Rehmani's] records consistently documented no abnormalities in terms of the claimant's ability to sustain attention and concentration.

(Tr. 19.) Plaintiff argues that the ALJ's statement is rebutted by Dr. Fucetola's findings. (Doc. 20 at 22-23.) However, as defendant argues, the ALJ was only referring to *Dr. Rehmani's findings*, not the *entire record*. The ALJ made this statement when assessing the opinion of Dr. Florian, which was contrary to Dr. Rehmani's assessment. (Tr. 19.)

In addition, the ALJ found that plaintiff suffered moderate difficulties with regard to concentration, persistence, and pace (Tr. 17), and limited plaintiff's RFC to only simple job tasks and no high production rate jobs. (Tr. 18-19.) These findings are consistent with the ALJ's determination that the entire record supported a finding of some

limitation in plaintiff's attention and concentration, although Dr. Rehmani's records alone contain no such support.

In sum, the ALJ did not err in noting that Dr. Rehmani's records did not indicate that plaintiff's attention and concentration were impaired.

## VI.  RECOMMENDATION

For the reasons set forth above, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security be affirmed under Sentence 4 of 42 U.S.C. § 405(g).

The parties are advised that they have 14 days to file written objections to this Report and Recommendation.  The failure to file timely written objections may waive the right to appeal issues of fact.


      /S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on January 31, 2011.